[Crim. No. 5913. Fifth Dist. July 21, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY WAYNE KELLETT, Defendant and Appellant.

952

---

COUNSEL

Barbara M. Rawson, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney

General, Willard F. Jones and Edmund D. McMurray, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MARTIN, J.*—Appellant was charged with two counts of grand theft (Pen. Code, § 487, subd. 1) and two counts of vehicle theft (Veh. Code, § 10851). Property taking enhancements were alleged as to each vehicle theft count (Pen. Code, § 12022.6, subd. (a)). Appellant was found guilty on all counts and was sentenced to the upper base term of three years for count three (vehicle theft) plus a one-year enhancement for the taking of property valued in excess of $25,000 (Pen. Code, § 12022.6, subd. (a)). He received an identical concurrent sentence as to count four (vehicle theft) and imposition of sentence was stayed as to counts one and two (grand theft).

These are the facts:

Sometime in 1980, Leonard Pyles met Dave Conroy in a Bakersfield cafe. Shortly after Easter 1981, Conroy telephoned Pyles and they discussed Central Valley Petroleum, which is located in Visalia. Pyles, a Visalia resident, was familiar with Central Valley.

Around this time, Pyles contacted FBI Agent Morrison. In early May 1981, Morrison introduced Pyles to Jerry Grimes of the Kern County Sheriff's Department. Pyles informed Grimes that Central Valley Petroleum was targeted for a theft.

Pyles had been personally involved in 10 to 12 oilfield thefts over the prior year, although he had not been in trouble with the law. Pyles offered to help the police. In return, he and his three brothers were granted immunity from prosecution.

Grimes and Pyles decided to catch Conroy in the act of stealing gas or diesel fuel from Central Valley Petroleum. Pyles was to tell Conroy that he was able to bribe the security person at Central Valley's yard.

Don Rose, owner of Central Valley Petroleum, was contacted and informed about the plan. Rose was to arrange to have trucks loaded with

---

*Assigned by the Chairperson of the Judicial Council.

fuel on the appointed day of theft. He was also to make sure the keys were left in the trucks.

On May 29, 1981, Pyles met with Grimes and Ed Jagels of the Kern County District Attorney's office. Prior to this meeting and subsequent to the post-Easter conversation mentioned above, Pyles had spoken to Conroy by telephone on two or three occasions. During the May 29 meeting, Pyles made telephone calls to the Kern County residences of Conroy and appellant. Conroy was not home and Pyles spoke with his wife.

On June 3, 1981, Pyles met with Grimes and made a tape-recorded telephone call to Conroy.[1] Conroy informed Pyles that he was still interested in the two loads of diesel to be picked up at Central Valley. Pyles was to receive $5,000 for each load.

On June 10, 1981, Pyles again met with Grimes at the Kern County Sheriff's Department. Pyles phoned Conroy. He assured him the theft would occur the following Monday or Tuesday, and that it was set up. Pyles suggested they all do the job together (referring to himself, Conroy, appellant and another unnamed person), but Conroy stated, "I may have them go by theirself [sic] . . . ." Pyles learned the "stuff" was going to Tracy.

Also on June 10, 1981, Pyles telephoned appellant. Pyles told him it would be Monday or Tuesday night for sure. He also told appellant to be sure to have something to cut through the gate as well as a means to hot wire the trucks. Appellant assured Pyles that he would "have everything with me."

On June 16, 1981, Pyles met with Grimes at the Downtowner Inn in Bakersfield. Pyles phoned appellant. He told him "it's set up there now." Shortly thereafter, Pyles phoned Conroy. He told Conroy the trucks would be ready and loaded between 1:30 and 2 a.m. They agreed to meet at Denny's in Visalia at 1 a.m. Conroy told Pyles he would make the payoff at that time. Pyles assured Conroy there would be two trucks, and Conroy assured Pyles that bolt cutters had been obtained to do the job. Conroy also informed Pyles that Jess Olivarez would be coming along to participate in the job.

---

[1]The tape of this conversation and several others made with both Conroy and appellant were introduced into evidence at trial as exhibits 14, 15, and 16. The tapes (with irrelevant parts being stricken) were played to the jury.

That evening, June 16, 1981, Pyles, Grimes, and other law enforcement individuals drove to Visalia. After midnight Grimes and other officers staked out the Central Valley Petroleum premises. At about 1 a.m. Pyles went to Denny's where he was to meet Conroy, Olivarez and appellant. When he arrived, each of the aforementioned individuals was present, as was a fourth individual, Bruce. While in the Denny's bathroom, Conroy gave $1,000 to Pyles for the ostensible purpose of bribing the gateman at Central Valley Petroleum.

Pyles, appellant, Bruce, and Olivarez left Denny's in a station wagon. They drove to the Central Valley Petroleum premises. Appellant and Bruce got out.

Appellant and Bruce cut the chain at the Central Valley gate. Each man started up a truck. There were two tankers of Transmix (mixture of gasoline and diesel) attached to each truck. They drove the trucks about 45 yards and were arrested.

Pyles and Olivarez were arrested about a mile from Central Valley Petroleum. Conroy was arrested in the Denny's parking lot.

No witnesses were called on behalf of the defendants. In closing argument, appellant's counsel raised two defenses. First, he contended appellant had been entrapped by the plans concocted by Pyles, Grimes and the Kern County District Attorney's office. Failing this defense, he argued that Don Rose, the Central Valley owner, had consented to the taking of the trucks by leaving the keys in the ignitions.

### DISCUSSION

### I.

At the close of the People's case, counsel for codefendant Bruce made a motion, joined by appellant's counsel, for a judgment of acquittal (Pen. Code, § 1118.1). The motion was premised on the theory that Kern County did not properly have jurisdiction in the case, since the alleged criminal act had occurred in Visalia, which is located in Tulare County. The trial court denied the motion holding, "I find that there is sufficient ties to Kern County in the planning stage of this matter to deny the motion .... "

In this appeal, appellant once again urges that jurisdiction was not proper in Kern County. Appellant's contention is premised on the fact that the only connection with Kern County in this case was the several telephone calls made by Pyles, which it is conceded, were made in Kern County. Appellant's contention is meritless.

The People relied on Penal Code section 781 in establishing jurisdiction in Kern County. Section 781 provides: "When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory."

Initially, it should be noted that section 781 "was intended to broaden criminal jurisdiction beyond the rigid limits fixed by the common law in cases of crimes committed in more than one jurisdiction. [Citations.]" (*People* v. *Powell* (1967) 67 Cal.2d 32, 63 [59 Cal.Rptr. 817, 429 P.2d 137].) For this reason, "... section 781 is liberally construed to vest jurisdictional venue in the court of a county where only preliminary acts leading to the commission of a crime in another territorial jurisdiction of California occur. [Citation.]" (*People* v. *Chapman* (1977) 72 Cal. App.3d 6, 11 [139 Cal.Rptr. 808].) Thus, the "acts" (as that term is used in § 781) vesting jurisdiction need not constitute an element of the crime charged. (*People* v. *Williams* (1973) 36 Cal.App.3d 262, 268 [111 Cal.Rptr. 378].) It is sufficient if the "acts" of the defendant are requisite to the completion of the criminal offense. (*Ibid.*)

In *People* v. *Tabucchi* (1976) 64 Cal.App.3d 133 [134 Cal.Rptr. 245], this court had occasion to review a trial court's determination that territorial jurisdiction was proper under section 781. We noted that the question of whether jurisdiction was proper in a criminal case is one of fact, which need be proven only by a preponderance of the evidence. (*Id.*, at p. 141.) On review, the trial court's determination will be upheld so long as "there is some evidence to support" its holding. (*Ibid.*)

In this case, there is more than sufficient evidence to support the trial court's ruling. As appellant concedes, informant Pyles made several telephone calls from Kern County telephones. These calls were placed to Dave Conroy and appellant, in Kern County, and the subject matter of the calls invariably involved the theft for which appellant was eventu-

ally tried. The parties discussed the compensation for Pyles' efforts in arranging the theft, the time of the crime, the place of the crime, the tools necessary for the commission of the offense, the eventual destination of the fuel to be stolen, and the place where the parties were to assemble immediately prior to the heist.

As we observed in *People* v. *Tabucchi, supra,* 64 Cal.App.3d 133, jurisdiction is proper in the county where the "preliminary arrangements" for the commission of a crime are made. (*Id.,* at p. 140.) Here, Pyles' telephone calls clearly involved preliminary arrangements which were requisite for the commission of the crime. Virtually every important element in the theft scheme was discussed in these calls, culminating in the final call when arrangements were made to meet in Visalia shortly before the theft.

*Ondarza* v. *Superior Court* (1980) 106 Cal.App.3d 195 [164 Cal. Rptr. 892], decided by this court, provides a case close in point. There, the defendant was convicted in Fresno County for having aided and abetted a sale of cocaine made by another individual in Santa Clara County. Jurisdiction was held to be proper in Fresno County, since the defendant ". . . made the preliminary arrangements for the transaction in Fresno County, including a telephone call from Fresno County to San Jose." (*Id.,* at p. 200.) Similarly here, the arrangements for the crime were made in Kern County while it was perpetrated elsewhere.

The finding of the trial court is supported by the evidence. (*People* v. *Tabucchi, supra,* 64 Cal.App.3d 133, 141.)

## II.

Appellant received a one-year enhancement pursuant to Penal Code section 12022.6. That section provides: "Any person who takes, damages or destroys any property in the commission or attempted commission of a felony, with the intent to cause such taking, damage or destruction, and the loss exceeds:

"(a) Twenty-five thousand dollars ($25,000), the court shall in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted impose an additional term of one year."

The applicability of the enhancement in this case was based on the value of the truck and trailer, which appellant entered and drove a short distance before being stopped by the authorities. Don Rose, the Central Valley owner, testified that the vehicle was worth over $25,000.

■ Appellant presents a novel contention which is apparently an issue of first impression in the appellate courts. He contends the imposition of the enhancement was improper since it was not shown that: (1) He had the intent to permanently deprive the owner of the stolen vehicle, and (2) the value of the loss (temporary dispossession of the vehicle) exceeded $25,000. In appellant's view, each of these elements must be proven beyond a reasonable doubt.[2]

Appellant contends the foregoing elements were not satisfied in this case where he was convicted of vehicle theft. Vehicle Code section 10851 provides that a culpable individual need not maintain the intent to permanently deprive the owner of possession of his vehicle. Guilt is established if the defendant maintains the intent to merely temporarily deprive the owner of possession. Therefore, argues appellant, the section 12022.6 enhancement would apply here only upon proof beyond a reasonable doubt that appellant intended a permanent deprivation of the stolen vehicle and that the actual loss suffered (by the temporary dispossession) exceeded $25,000. Appellant's argument is not persuasive.

Initially, appellant's reliance on the elements of the felony (vehicle theft) underlying his enhancement is misplaced. In enacting section 12022.6, the Legislature did not intend that a taking was to be a necessary element of the underlying crime in order to impose the enhancement. (See Cassou & Taugher, *Determinate Sentencing in California: The New Numbers Game* (1978) 9 Pacific L.J. 5, 45.) Thus, appellant errs in placing primary reliance on the fact that culpability for vehicle theft requires only the intent to temporarily take a vehicle. The Legislature was not concerned with the crime committed by a defendant so long as property valued in excess of $25,000 was taken.

Moreover, the clear language of the statute is contrary to appellant's interpretation. Section 12022.6 provides that the enhancement may be given to "[a]ny person who takes ... property ... with the intent to

---

[2] A section 12022.6 enhancement must be proven beyond a reasonable doubt. (Pen. Code, § 1170.1, subd. (e), *People v. Ramos* (1980) 106 Cal.App.3d 591, 604 [165 Cal.Rptr. 179].)

cause such taking . . . ." The statute does not on its face require the intent to permanently deprive the owner of property, but rather that the property be intentionally rather than accidentally taken. The dictionary definition of "take" is "to get into one's hands or into one's possession . . . ." (Webster's Third New Internat. Dict. (1961) p. 2329.) The length of time for which the property may be retained has nothing to do with the initial intent to take the property.

The purpose of section 12022.6 also militates strongly against appellant's position. In enacting this section, the Legislature sought to deter large-scale crime. (*People* v. *Hughes* (1980) 112 Cal.App.3d 452, 459 [169 Cal.Rptr. 364]; *People* v. *Ramirez* (1980) 109 Cal.App.3d 529, 539 [167 Cal.Rptr. 174].) The courts are, of course, bound to construe section 12022.6 in accordance with this purpose. (58 Cal.Jur.3d, Statutes, § 83, p. 431.)

The facts of this case indicate the purpose of the statute is served by imposing an enhancement. Appellant and his associates intended to drive the valuable truck from its berth in Visalia to a destination in Tracy where the fuel would be sold. While the record is silent as to what the defendants intended to do with the trucks once the fuel had been sold, it can be reasonably assumed they had no intent to return them to the owner in Visalia. Thus, even if the defendants intended only a temporary use of the trucks, and thereafter intended to abandon them, liability would still lie under section 12022.6. This is certainly the type of large-scale crime the Legislature intended to punish. (*People* v. *Hughes, supra*, 112 Cal.App.3d 452, 459; *People* v. *Ramirez, supra*, 109 Cal.App.3d 529, 539.)

Finally, the few cases which have been litigated under section 12022.6 offer no solace to appellant. In both *People* v. *Bates* (1980) 113 Cal.App.3d 481 [169 Cal.Rptr. 853], and *People* v. *Ramirez, supra*, 109 Cal.App.3d 529, it was contended that a section 12022.6 enhancement cannot be imposed unless it is shown that the victim has actually suffered a loss.[3] In both cases, it was held to be irrelevant whether the victims suffered a loss so long as the defendants initially intended to take the property. (113 Cal.App.3d at pp. 483-484, 109 Cal. App.3d at pp. 539-540.)

---

[3]In *Bates*, appellant was arrested shortly after stealing gold nuggets and the gold was recovered. In *Ramirez*, appellants were convicted of grand theft from a bank based on bogus wire transfers of funds, and contended it was not shown the bank had failed to recover its stolen funds.

*People* v. *Bates, supra*, 113 Cal.App.3d 481, although not directly in point, contains language which is contrary to appellant's position. Having found that the Legislature intended to impose additional punishment commensurate with the seriousness of the offense committed, the court concluded that: "[t]he word 'loss,' as used in section 12022.6 in the context of the *taking* of property, therefore includes any dispossession which constitutes theft of the victim's property." (*Id.*, at p. 484.) This principle readily applies to the instant case.

Even assuming arguendo that appellant intended only a temporary taking of the victim's trucks, the *Bates* court would find a "loss" within the meaning of section 12022.6, that is, an intentional taking, without regard for the duration of the dispossession.

In short, there does not appear to be any reason either in logic, or the case law, to adopt appellant's interpretation of section 12022.6. The Legislature intended to deter large-scale crime. (*People* v. *Hughes, supra*, 112 Cal.App.3d 452, 459.) That purpose is served in this case by imposing an additional punishment on appellant.

### III.

The trial court denied appellant's motion for probation, and imposed the upper base term of three years for his vehicle theft conviction. In so doing, the court relied on several factors: (1) The planning, sophistication or professionalism with which the crime was carried out; (2) appellant was a dominant party; (3) appellant did a lot of telephone-calling; (4) appellant's convictions were of increasing seriousness; and (5) appellant was awaiting trial on an oil theft charge at the time he committed the instant offense. Appellant contends it was error to rely on each of these factors. In addition, appellant contends the court erroneously failed to consider the mitigating circumstance that appellant was subject to over-reaching conduct by the police, although his entrapment defense was rejected by the jury. While one and arguably two of the factors relied upon by the court may have been improper, in the final analysis the court did not abuse its discretion in giving appellant the upper term.

Initially, appellant raises one additional contention. He cites as error the court's omission to state the reasons for its denial of probation. Appellant is correct that reasons were not stated. However, the court's citation of reasons for imposing the upper base term cured any

harm flowing from its omission to state reasons for denying probation. (*People* v. *West* (1980) 107 Cal.App.3d 987, 995 [165 Cal.Rptr. 24]; *People* v. *Ramos, supra*, 106 Cal.App.3d 591, 599-600.)

Next, appellant mounts an attack on each factor in aggravation relied on by the court. Each factor will be considered in turn.

■ Factor one was the planning and professionalism with which the crime was carried out (Cal. Rules of Court, rule 421(a)(8)). Appellant contends the plans for the crime were made primarily by Pyles and the police, with some arrangements by Conroy. This argument overlooks the fact that in one of his telephone conversations with Pyles, appellant assured Pyles he would have the necessary tools and knowledge to cut through the gate and hotwire the trucks. Further, bolt cutters were seized from appellant at the time of his arrest. This evidence is more than sufficient to justify the court's assessment that appellant had been party to the planning of the crime and had acted in a professional manner at the time of its commission. (See *People* v. *Mathews* (1980) 102 Cal.App.3d 704, 710 [162 Cal.Rptr. 615].)

■ Factor two refers to the court's characterization of appellant as a dominant party (Cal. Rules of Court, rule 421(a)(5)). Pyles, Grimes and Conroy did the majority of the planning here, and it was Conroy who brought Bruce and Olivarez into the plan. However, appellant, almost from the beginning, was in frequent contact with Conroy and Pyles. It was appellant who planned to cut the chain on the gate and hotwire the trucks. And it was appellant with Bruce who ultimately cut the chain, entered the premises and started up the trucks.

Rule 421(a)(5) requires that the defendant has either induced others to participate in the crime, or has "occupied a position of leadership or dominance of other participants...." Here there is evidence appellant occupied a position of leadership, although not the dominant position occupied by Conroy, and we cannot say it was error for the court below to consider this factor in imposing the upper term.

■ Factor three is the trial court's characterization of appellant as "the one that did a lot of phone calling." The fact that appellant did a lot of telephone calling was certainly considered by the court below in factor two and should not also be used as a separate factor here. Additionally, it is difficult to perceive how this fact, without more, can

constitute a separate factor in aggravation under any subdivision of rule 421. The trial court erred in relying on factor three.

■ Factor four, the increasing seriousness of appellant's criminal convictions, is a proper factor. Prior to the instant case, appellant had been convicted for Unemployment Insurance Code violations and disturbing the peace.[4] Thus, conviction for vehicle theft was clearly an offense of greater seriousness.

■ The final factor was also properly considered. The court stated: "I'll tell you one thing that really bothers me, Mr. Heider [defense counsel], and that is he [appellant] has been arrested on February 9, 1981, for the exact same thing, and then again on June 17, 1981." The sentencing court may rely on a defendant's prior arrests so long as they are factually supported. (*People* v. *Hubbell* (1980) 108 Cal.App.3d 253, 256-257 [166 Cal.Rptr. 466]; *People* v. *Taylor* (1979) 92 Cal. App.3d 831, 833 [155 Cal.Rptr. 62].) Here, appellant's trial counsel conceded that appellant had a pending case concerning another oil theft. It was entirely appropriate for the court to rely on this factor.

■ Finally, appellant contends the trial court erred by failing to consider the fact that the entire heist was a police setup. While appellant's entrapment defense was rejected by the jury, it is nonetheless true that evidence of a police setup could have been considered as a factor in mitigation under California Rules of Court, rule 423(a)(5), which provides a circumstance in mitigation where "[a] defendant with no apparent predisposition to do so was induced by others to participate in the crime."

We conclude the court properly ignored appellant's entrapment protestations. While the theft was set up by the police, there was no evidence appellant was pressured into participation. He entered the scheme of his own free will and at an early point in the planning. Thus, the fact that appellant walked into a police stakeout was of no help to him in the sentencing proceedings.

■ We now turn to a consideration of the effect of the trial court's improper consideration of factor three. A remand for resentencing is required only where it is reasonably probable a different result would

---

[4]These prior convictions were mentioned by appellant's counsel at the sentencing hearing. The probation report is not part of the record on appeal.

have occurred had the improper factor not been considered. (*People* v. *Edwards* (1981) 117 Cal.App.3d 436, 446 [172 Cal.Rptr. 652].) In examining the reasonable probability of a different result without the offending factor, the appellate court should engage in a "quantitive and *qualitative* analysis" of the remaining factors. (*People* v. *Lambeth* (1980) 112 Cal.App.3d 495, 501 [169 Cal.Rptr. 193].)

Here, the remaining factors are both quantitively and qualitatively sufficient to avoid a remand. The four remaining factors are obviously quantitively sufficient, since it has been held that one factor standing alone may justify imposition of the upper base term. (*People* v. *Burney* (1981) 115 Cal.App.3d 497, 505 [171 Cal.Rptr. 329]; *People* v. *Covino* (1980) 100 Cal.App.3d 660, 670 [161 Cal.Rptr. 155].)

Moreover, it is apparent from the record the key qualitative factor in the trial court's decision to impose the upper base term was the fact appellant had been twice arrested for the same offense within a span of five months. Since the most important of the trial court's factors survives appellate scrutiny, it cannot be said it is reasonably probable a different sentencing choice would have been made absent the improper factor. (*People* v. *Edwards, supra*, 117 Cal.App.3d 436, 446.)

The judgment is affirmed.

Zenovich, Acting P. J., and Hanson (P. D.), J., concurred.